# DISTRICT COURT OF APPEAL OF FLORIDA
## SECOND DISTRICT

_____

ANNE McQUEEN,

Appellant,

v.

CAROLE BASKIN,

Appellee.

No. 2D22-1482

_____

November 17, 2023

Appeal from the Circuit Court for Hillsborough County; Jennifer X.
Gabbard, Judge.

Allison Morat and Ronnie Bitman of Bitman, O'Brien & Morat, PLLC,
Lake Mary; John M. Phillips and Amy M. Hanna of Phillips & Hunt,
Jacksonville, for Appellant.

Shane B. Vogt and Kenneth G. Turkel of Turkel, Cuva, Barrios, P.A.,
Tampa; David M. Caldevilla of de la Parte, Gilbert, McNamara &
Caldevilla, P.A., Tampa; Craig E. Rothburd of Craig E. Rothburd, P.A.,
Tampa; and Charles M. Harris of Trenam Law, Saint Petersburg, for
Appellee.


LUCAS, Judge.

A sanctuary for lions and tigers, the unexplained disappearance of
one of its owners, and competing allegations of embezzlement, double-

dealing, and betrayal have spawned a defamation lawsuit. Near the outset of the litigation, the circuit court curtailed discovery and entered a final judgment in favor of the defendant. For the reasons that follow, we reverse.

I.

In the 1990s Carole Baskin and her then-husband "Don" Lewis operated Wildlife on EasyStreet, a big cat sanctuary, an enterprise which would later become known as Big Cat Rescue.[1] Anne McQueen was employed as Mr. Lewis' personal assistant.

In August 1997, Mr. Lewis disappeared. His whereabouts, or whether he is still alive, remains unknown to this day.

Not long after Mr. Lewis' disappearance, one of his daughters filed a conservatorship petition in the Hillsborough County Circuit Court. In that petition Mr. Lewis' daughter sought to appoint Ms. McQueen as a conservator of Mr. Lewis' property. Disputes arose during the course of the conservatorship proceedings. Ms. Baskin alleged that Ms. McQueen "improperly transferred real property, mortgages, and tax certificates." For her part, Ms. McQueen filed a petition for an injunction. After a year of litigation, the parties entered into a stipulation which disposed of the property in dispute. As part of that settlement, Ms. McQueen received a $50,000 payment for all her potential claims in the conservatorship litigation including a "libel and slander claim" against Ms. Baskin. Ms.

---

[1] A big cat sanctuary, counsel informs us, is "a sanctuary for exotic cats and a leading advocate for ending the abuse of captive exotic cats and saving wild cats from extinction." Because of the procedural posture of this case when the circuit court entered judgment, many of the factual recitations that follow are based on counsel's representations in their filings below and briefings before this court.

Baskin was also obligated to issue a written apology to Ms. McQueen,[2] which, in pertinent part, read: "I, Carole Lewis, apologize to Anne McQueen for all the allegations that I have made about Anne McQueen. . . . I have found that the allegations made were without full knowledge of the facts, which I now know are unfounded."

Unfortunately, neither the settlement nor the apology ended the acrimony.

Events took a turn in 2020 when Netflix aired a television series entitled, "*Tiger King: Murder, Mayhem and Madness.*" The subject matter of the series was apparently as sensational as its title, and although it centered on a supposed rival of Big Cat Rescue (a gentleman who went by the monikers "Joe Exotic" and "The Tiger King"), some episodes featured discussions about Mr. Lewis' disappearance. One episode in particular included footage of interviews with Ms. McQueen, which, Ms. Baskin maintains, "proliferated false and baseless rumors that Baskin killed Lewis and disposed of his remains in various horrific ways." While the show was airing, Ms. McQueen also appeared in a YouTube[3] interview with "*Ripper Jack Media,*" in which she discussed Mr. Lewis' disappearance.

---

[2] In her briefing, Ms. Baskin points out that the settlement agreement in the conservatorship litigation expressly disclaimed being an admission of any kind of liability.

[3] "YouTube is a video sharing service that allows users to watch videos posted by other users and upload videos of their own." *Forrest v. Citi Residential Lending, Inc.,* 73 So. 3d 269, 271 n.1 (Fla. 2d DCA 2011) (quoting *YouTube,* TechTerms.com, http://techterms.com/definition/youtube (last visited October 11, 2023)).

In the aftermath of *Tiger King*, Ms. Baskin maintains that "enormous public discussion" ensued concerning her purported involvement in Mr. Lewis' disappearance. She complains that she, her current husband, and Big Cat Rescue "became the target of vicious online attacks."

Ms. Baskin, however, had apparently anticipated that she might receive some less than favorable coverage in *Tiger King*. So, in February 2020, prior to the show's release, she began publishing her own rendition about the events that would later be depicted in *Tiger King* on her YouTube "vlog" (hereafter, the Baskin Vlog).[4] In her vlog, Ms. Baskin read aloud a number of entries in her personal diary, some of which were decades old. Although at points in the Baskin Vlog's postings Ms. Baskin acknowledges that her recollections might "be a little skewed on some of the things that I remember" and that the video entries are "for entertainment purposes only," the Baskin Vlog was obviously meant to relay Ms. Baskin's assertions of what truly happened at Big Cat Rescue in the late 1990s.

Over a period of time, Ms. Baskin made the following assertions in the Baskin Vlog[5]:

---

[4] "A 'vlog' is a personal telecast or video diary wherein a person records his or her entries and uploads them to the internet for others to view." *Lulu Enters., Inc. v. N-F Newsite, LLC*, No. 5:07-CV-347-D, 2007 WL 3101011, at *1 n.1 (E.D.N.C. Oct. 19, 2007) (citing PC Magazine Encyclopedia, "Vlog," http://www.pcmag.com/encyclopedia-term/0,2542,t=vlog & i=54024,00.asp).

[5] Ms. Baskin prepared a chart of a compilation of the allegedly defamatory statements and descriptions of statements that was used as a demonstrative aid at the summary judgment hearing. The statements referenced herein are replicated from that chart.

"Turns out he [Mr. Lewis] had already had Anne McQueen forge my name on the closing documents and then she notarized it."

"Spent the day in our real estate office quizzing Anne McQueen about the title search I did on her showing 500,000.00 + of our properties titled in her maiden name. This had all been done in just the past few months. I asked for the alarm code and a set of keys (ours were with Don) and I had never had to open the office before. . . . When I asked for a set of keys, Anne was suddenly very sick with a headache and had to go home. Since she claims she was the only person with a set of keys and the code, everyone would have to leave so she could lock up. [I] knew something was up then. She said she had to rest, but that she would make me a set later that night and bring them to me in the morning. She gave me a bogus alarm code."

"I have gone easy on her [Ms. McQueen] because I have not been sure how much of her transferring was done as theft and how much Don may have known about, but for her to step in and lie about something that we both know the truth about and her attempt to destroy my original documents by sneaking them out of the office in a box of her tax papers. I can see no reason to protect her any longer. Can she be arrested for embezzling and can your firm represent me in the ensuing lawsuit? The proof is overwhelming."

"Anne McQueen was feeding people nothing but lies, it's suspicious Anne is the beneficiary of such a huge life insurance policy, and Anne and others are sure Don isn't coming back."

"The return of the 80,000.00 that Anne McQueen has wrongfully diverted from the Conservatorship to her own Attorney's bank account."

"That is why I want to see Anne in jail for embezzlement. She and Wendell may have gotten away with doing harm to Don but they haven't escaped all of their treacherous deeds. I want what little justice Don and I may ever see from this whole ordeal."

Ms. McQueen was "spiriting documents away" to attempt to hide "all of the stuff that was going on with Anne putting stuff

into her name and Wendell's name and housekeeper's names and all kinds of stuff."

"Part of the embezzlement I discovered was that Anne would take money from our checking account to buy those tax certificates in her maiden name so that she could control if the properties were sold to pay her lien."

Over roughly the same time period as she was vlogging, Ms. Baskin is also alleged to have posted the following statements on Big Cat Rescue's website:

In 1997 when I lost my Husband, I discovered that one of our secretaries had embezzled hundreds of thousands of dollars and made herself the beneficiary and executor of his will.

Anne McQueen is referred to as Don's trusted assistant. A few months before his disappearance we caught her embezzling roughly $600,000.00 in properties by buying them with our funds and putting them in her name.

In August 2020, Ms. McQueen and members of Mr. Lewis' family filed a complaint seeking a pure bill of discovery as to several defendants, an action which, after a few amendments, evolved into a civil claim for monetary damages brought solely by Ms. McQueen against Ms. Baskin as the sole defendant. That complaint asserts claims for defamation (under three different theories).[6]

On July 9, 2021, Ms. Baskin filed a verified "Motion to Dismiss and/or for Summary Judgment on Second Amended Complaint and for Attorney's Fees and Costs Under Florida's Anti-SLAPP Statute" in response to the complaint. In her motion, Ms. Baskin maintained that

---

[6] The complaint also included one count for breach of contract and fiduciary duty. Ms. McQueen never filed any opposition to Ms. Baskin's motion as to this count. Moreover, Ms. McQueen has not challenged the circuit court's adjudication of that count in this appeal. Ms. McQueen has thus abandoned that issue, and so we affirm the circuit court's judgment as to that count.

6

Ms. McQueen's complaint amounted to a prohibited SLAPP lawsuit[7] under section 768.295, Florida Statutes (2020), and that, as such, she was entitled to "an expeditious resolution" of Ms. McQueen's claim. *See* § 768.295(4). She argued that the statements Ms. McQueen was suing her on constituted protected "free speech in connection with a public issue" and that Ms. McQueen's claim was without merit. *See* § 768.295(3).

Furthermore, Ms. Baskin argued that her vlog and website posts fell under the protection of section 770.01, Florida Statutes (2020), which requires presuit notice as a condition precedent when a defamation action is brought "for publication or broadcast, in a newspaper, periodical, or other medium." Ms. Baskin contended that the Baskin Vlog and her web posts should be construed as "other medium" under this statute and that Ms. McQueen's subsequent service of a statutory notice to Ms. Baskin[8] was insufficient to cure what, she suggests, was a "jurisdictional" defect in Ms. McQueen's complaint. Finally, Ms. Baskin's motion argued that all of her alleged statements were nondefamatory as a matter of law.

_____

[7] SLAPP: Strategic Lawsuits Against Public Participation. Anti-SLAPP state statutes are common throughout the United States. *See generally* Nicole J. Ligon, *Protecting Local News Outlets from Fatal Legal Expenses*, 95 N.Y.U. L. Rev. Online 280, 292 (2020) ("[A]nti-SLAPP statutes[] have been enacted in thirty-one states.").

[8] Ms. McQueen served a notice to counsel pursuant to section 770.01 on January 27, 2021. In that notice, which stated it was being served "in an abundance of caution and to dispense with any argument to the contrary," Ms. McQueen referenced statements made in the prior twelve months. We make no comment about the sufficiency or efficacy of this notice.

Before Ms. McQueen could obtain discovery or depose Ms. Baskin, the circuit court stayed discovery. The court's stay order indicated that it would first hear and decide Ms. Baskin's motion. Both sides filed memoranda, and on October 6, 2021, the court heard the motion to dismiss/motion for summary judgment.

On April 6, 2022, the court issued an order and final judgment against Ms. McQueen. Pertinent to our resolution of this appeal, the circuit court concluded that (1) Ms. Baskin was a "media defendant" so that the statements on her vlog and website were protected under section 770.01, (2) Ms. McQueen's complaint was a prohibited SLAPP lawsuit under section 768.295, and (3) the statements complained of "cannot be construed as conveying a defamatory meaning . . . or are nonactionable statements of opinion or rhetorical hyperbole."[9]

This is Ms. McQueen's timely appeal.

## II.

It is not entirely clear which procedural mechanism, a motion to dismiss under Florida Rule of Civil Procedure 1.140(b) or a motion for summary judgment under rule 1.510, was principally utilized in each of

---

[9] The court also found that Ms. McQueen failed to comply with the time strictures of Florida Rule of Civil Procedure 1.510(c)(5) in serving her responses to the motion for summary judgment, that there was no evidence of proximate causation, that Ms. McQueen was a "public figure" who could not establish actual malice, and that, in all events, the "fair report privilege" would apply to certain statements in the complaint.

We would observe that the motion before the court was something of a hybrid between a motion to dismiss and a motion for summary judgment. And the circuit court stayed discovery before the parties could develop much of a factual record. Our resolution of the three preliminary issues we've identified, and our remand to the court to allow this case to develop further, will necessarily require the circuit court to reexamine all these conclusions should these issues arise again.

8

the circuit court's findings throughout its order and judgment. This is likely due to the manner Ms. Baskin presented her legal arguments (as a single, unitary motion that asserted both rules without delineating which arguments were for dismissal and which were for summary judgment) as well as the expedience the circuit court felt was required under the Anti-SLAPP statute. But regardless of which parts of the order and judgment came about as a dismissal with prejudice or as a final summary judgment, our review would be the same: de novo. *See Desch v. S. Fork of Hillsborough Cnty. II Homeowner's Ass'n*, 364 So. 3d 1064, 1067 (Fla. 2d DCA 2023) ("We conduct a de novo review of a trial court's ruling that grants summary judgment."); *Ellerson v. Moriarty*, 331 So. 3d 767, 769 (Fla. 2d DCA 2021) ("We review an order of dismissal with prejudice de novo.").

### III.

Our analysis will proceed in the order we deem to be the appropriate approach for resolving the somewhat intertwined legal issues presented below: first, we address whether the alleged statements published in the Baskin Vlog and on Big Cat Rescue's website were defamatory—and, hence, potentially actionable—under Florida law. Then, we will discuss whether Ms. Baskin was a "media defendant" entitled to statutory notice (and an opportunity for retraction or correction) of those statements.

### A.

Florida's Anti-SLAPP statute protects

> the right in Florida to exercise the rights of free speech in connection with public issues, and the rights to peacefully assemble, instruct representatives, and petition for redress of grievances before the various governmental entities of this state as protected by the First Amendment to the United States Constitution and s. 5, Art. I of the State Constitution.

9

§ 768.295(1).  It does so by prohibiting

> any lawsuit, cause of action, claim, cross-claim, or counterclaim against another person or entity *without merit and primarily because* such person or entity has exercised the constitutional right of free speech in connection with a public issue, or right to peacefully assemble, to instruct representatives of government, or to petition for redress of grievances . . . .

§ 768.295(3) (emphasis added).  The legislature tied the protections of the Anti-SLAPP statute to speech "protected" by the First Amendment of the United States Constitution and article I, section 5, of the Florida Constitution; and it clarified that the prohibition against lawsuits challenging protected speech applied only to claims "without merit and primarily because" of protected speech.  *Accord Lab'y Corp. of Am. v. Davis*, 339 So. 3d 318, 323 (Fla. 2022) ("In interpreting a statute, our task is to give effect to the words that the legislature has employed in the statutory text.  'The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.' " (quoting *Ham v. Portfolio Recovery Assocs.*, 308 So. 3d 942, 946 (Fla. 2020))).

Actionable defamation, however, is not constitutionally protected speech.  *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.  These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words . . . ." (footnote omitted)); *Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1215 (Fla. 2010) ("As explained by the U.S. Supreme Court, 'the potential chill on protected First Amendment activity stemming from libel and defamation actions is already taken into account in the constitutional

10

limitations on the substantive law governing such suits.' " (quoting *Calder v. Jones*, 465 U.S. 783, 790 (1984))); *Fox v. Hamptons at Metrowest Condo. Ass'n*, 223 So. 3d 453, 457 (Fla. 5th DCA 2017) ("Freedom of speech does not extend to obscenity, defamation, fraud, incitement, true threats, and speech integral to criminal conduct." (citing *United States v. Cassidy*, 814 F. Supp. 2d 574, 582-83 (D. Md. 2011))). The first question to resolve, then, is whether Ms. Baskin's published statements could support a defamation claim.

In Florida, a defamation claim comprises five elements: (1) publication, (2) of a false statement, (3) with knowledge or reckless disregard as to the falsity (for public figures) or negligence (for private figures), (4) which causes actual damages, and (5) is "defamatory." *See Kieffer v. Atheists of Fla., Inc.*, 269 So. 3d 656, 659 (Fla. 2d DCA 2019) (quoting *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)). The Fourth District explained that a "communication is 'defamatory' if it tends to harm the reputation of another as to lower him or her in estimation of community or deter third persons from associating or dealing with the defamed party." *See Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841, 845 (Fla. 4th DCA 2002).

In the case at bar, the circuit court focused predominantly on the last element,[10] concluding that Ms. Baskin's published statements were

---

[10] The second, third, and fourth elements often pose factual questions that, in the case at bar, the parties could not explore in depth due to the court's discovery stay. It cannot be said that there were no genuine issues of material fact in dispute such that Ms. Baskin was entitled to judgment as a matter of law on any of those elements of her defamation claim. *See* Fla. R. Civ. P. 1.510; *Kimball v. Publix Super Mkts., Inc.*, 901 So. 2d 293, 295 (Fla. 2d DCA 2005) ("[I]t is reversible error to enter summary judgment when relevant discovery is pending." (first citing *Colby v. Ellis*, 562 So. 2d 356 (Fla. 2d DCA 1990); and then

11

not defamatory as a matter of law. In its judgment, the circuit court viewed all the statements, collectively, as "mental impressions, opinions or commentary" that "[t]he common viewer or reader would understand . . . were one-sided responses to the events that occurred decades ago but were reinvigorated by the *Tiger King* series." We cannot agree with that assessment.

Whether a published statement is a protected expression of pure opinion versus an actionable expression of fact or mixed opinion and fact poses a question of law. *See E. Air Lines, Inc. v. Gellert*, 438 So. 2d 923, 927 (Fla. 3d DCA 1983) ("It is the court's function to determine from the context 'whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct.' " (quoting Restatement (Second) of Torts § 566 cmt. c (Am. L. Inst. 1977))); *Colodny v. Iverson, Yoakum, Papiano & Hatch*, 936 F. Supp. 917, 923 (M.D. Fla. 1996) (citing *Fla. Med. Ctr., Inc. v. N.Y. Post Co.*, 568 So. 2d 454, 457 (Fla. 4th DCA 1990)).[11] From our de novo review, we conclude that several of the

---

citing *Abbate v. Publix Super Mkts., Inc.*, 632 So. 2d 1141 (Fla. 4th DCA 1994))).

[11] The Supreme Court explained the importance of the distinction between expressions of opinion and expressions of fact in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974):

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open"

recorded statements published in the Baskin Vlog and on the Big Cat Rescue website were factual assertions of past events. Indeed, it is hard to construe Ms. Baskin's alleged assertions that Ms. McQueen forged and notarized closing documents, lied about and attempted to hide the transfer of properties from Ms. Baskin (which, Ms. Baskin bluntly claimed was "theft"), attempted to destroy original documents, "spirited" other documents away, "wrongfully diverted" money into her attorney's bank account, and embezzled funds as anything other than assertions of fact. The character of these statements, if they are false, would be quintessentially defamatory. *See, e.g.*, *Blake v. Giustibelli*, 182 So. 3d 881, 884 (Fla. 4th DCA 2016) ("[A] publication is libelous per se, or actionable per se [against a nonmedia defendant], if, when considered alone without innuendo: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession." (first alteration in original) (quoting *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953))); *Lipsig v. Ramlawi*, 760 So. 2d 170, 182, 185 (Fla. 3d DCA 2000) (affirming slander counterclaim verdict where partnership's attorney referred to former partner as a "thief" who had mismanaged the partnership's businesses as such statements did not constitute mere opinion, and noting that "Amin clearly imputed to Ramlawi conduct incompatible with the proper exercise of his business, and accordingly this accusation was slanderous *per se*" (first citing *Teare v. Local Union No. 295*, 98 So. 2d 79, 82 (Fla. 1957); and then citing *Scholz v. RDV*

---

debate on public issues. *New York Times Co. v. Sullivan*, 376 U.S. [254, 270 (1964)].

13

*Sports, Inc.*, 710 So. 2d 618, 625 (Fla. 5th DCA 1998))); *Axelrod v. Califano*, 357 So. 2d 1048, 1050 (Fla. 1st DCA 1978) (statements that a former employee was a thief and a forger were actionable per se).

Besides the nature of the statements themselves, Ms. Baskin employed a contemporaneously recorded diary in her vlog as a seeming aid to her recollection of past factual events. And although Ms. Baskin may have offered a qualification about the nature of her vlog and couched certain parts as her personal opinion, actionable defamatory statements do not become nondefamatory when, as here, the context of the statements swallows up the caveats. *See Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18-19 (1990) ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.' "); *Lipsig,* 760 So. 2d at 184 ("However, a speaker cannot invoke a 'pure opinion' defense, if the facts underlying the opinion are false or inaccurately presented."); *see also Jews for Jesus*, 997 So. 2d at 1108 ("[W]hile defamation law shields publishers from liability for minor factual inaccuracies, 'it also works in reverse, to impose liability upon the defendant who has the details right but the "gist" wrong.' " (quoting W. Page Keeton, et al.*, Prosser and Keeton on the Law of Torts*, § 116, at 117 (5th ed. Supp. 1988))). Nor can we ignore that Ms. Baskin had previously issued a written apology to Ms. McQueen for her "unfounded" allegations which she had made "without full knowledge of the facts."

Finally, we must note that the circuit court's conclusion that Ms. Baskin's published statements were mere opinion, hyperbole, or mental impressions is somewhat incongruous with the court's conclusion elsewhere that Ms. Baskin was a "media defendant" who "regularly posts information" and "shares information that is of public interest." We will turn to that point in a moment, but for now, it suffices to observe that the media defense under section 720.01 is not typically available for "hyperbole and mental impressions"; rather, the statute serves to protect the dissemination of news and news commentary. *Cf. Ross v. Gore*, 48 So. 2d 412, 415 (Fla. 1950) ("The public has an interest in the free dissemination of news. . . . This opportunity, given by the statute, to correct inadvertent errors prior to suit is, in our opinion, no more than fairly and justly commensurate with the opportunity to make the errors.").

In sum, we conclude that Ms. McQueen's complaint included allegations of statements of fact and that those statements, if proven, could be defamatory as a matter of law. As such, the statements were not protected speech under the Anti-SLAPP statute.

B.

That, however, does not end our inquiry. Ms. Baskin contends she should be considered a "media defendant" entitled to the statutory protections of section 770.01, including prior notice and an opportunity to retract any allegedly defamatory statements she may have made. The circuit court agreed and concluded she was a media defendant; we conclude otherwise.

We look first to the text of the statute Ms. Baskin invokes. Section 770.01 provides:

15

Before any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory.

In conjunction with section 770.01, section 770.02 states:

(1) If it appears upon the trial that said article or broadcast was published in good faith; that its falsity was due to an honest mistake of the facts; that there were reasonable grounds for believing that the statements in said article or broadcast were true; and that, within the period of time specified in subsection (2), a full and fair correction, apology, or retraction was, in the case of a newspaper or periodical, published in the same editions or corresponding issues of the newspaper or periodical in which said article appeared and in as conspicuous place and type as said original article or, in the case of a broadcast, the correction, apology, or retraction was broadcast at a comparable time, then the plaintiff in such case shall recover only actual damages.

(2) Full and fair correction, apology, or retraction shall be made:

(a) In the case of a broadcast or a daily or weekly newspaper or periodical, within 10 days after service of notice;
(b) In the case of a newspaper or periodical published semimonthly, within 20 days after service of notice;
(c) In the case of a newspaper or periodical published monthly, within 45 days after service of notice; and
(d) In the case of a newspaper or periodical published less frequently than monthly, in the next issue, provided notice is served no later than 45 days prior to such publication.

Ms. Baskin believes her vlog and website posts constitute "other medium" for purposes of the statute, such that she's entitled to the protections of these sections. She is mistaken.

We explained the construction of "other medium" at some length in *Mazur v. Ospina Baraya*, 275 So. 3d 812, 815-16 (Fla. 2d DCA 2019). In *Mazur*, a plaintiff sued Penguin Random House, Hachette Book Group,

16

movie production companies, and affiliated individuals. *Id.* at 814. The plaintiff alleged he was defamed by his portrayal as a money launderer and "integral member" of Pablo Escobar's criminal organization in the book *The Infiltrator* and the movie based on that book. *Id.* The defendants moved to dismiss the complaint, arguing that the plaintiff failed to comply with the presuit conditions of section 770.01. *Id.* The circuit court denied their motion. *Id.*

On certiorari review, we summarized how to construe these statutes:

> Sections 770.01 and 770.02 work together "to afford newspapers and periodicals an opportunity to make full retraction in order to correct inadvertent errors and mitigate damages, as well as to save them the expense of answering to an unfounded suit for libel." *Bridges*, 449 So. 2d at 401 (citing *Ross*, 48 So. 2d 412).

> Considering that the purpose behind section 770.01 is to protect the free press, Florida courts have interpreted the statute's "other medium" language to be limited to news media defendants who publish statements via an "other medium." To determine whether a defendant's publication falls "within the purview of the prescribed 'other medium' entitled to presuit notice, we look to the *Ross* decision to determine whether the [defendant's publication] is operated to further the free dissemination of information *or* disinterested and neutral commentary or editorializing as to matters of public interest." *Comins v. Vanvoorhis*, 135 So. 3d 545, 557 (Fla. 5th DCA 2014). "In defining the term 'media defendant,' courts have considered whether the defendant engages in the traditional function of the news media, which is 'to initiate uninhibited, robust, and wide-open debate on public issues.' " *Tobinick v. Novella*, No. 9:14-CV-80781, 2015 WL 1191267, at *8 (S.D. Fla. March 16, 2015) (quoting *Ortega Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1338 (S.D. Fla. 1998)). So even though the "other medium" language expanded section 770.01 to cover new technologies used to disseminate the news, such as internet publishers and blogs, it did not expand the reach of the statute beyond the news

17

media. *See, e.g.*, *Plant Food Sys., Inc. v. Irey*, 165 So. 3d 859, 861 (Fla. 5th DCA 2015) (holding that "an internet publisher of various purportedly scientific, technical, and medical journals and information" was covered by section 770.01); *Comins*, 135 So. 3d at 559 (holding that a blog was covered by section 770.01 and noting that "many blogs and bloggers will fall within the broad reach of 'media' " because many blogs have "primarily an informational purpose" and "usually provide[ ] for public impact or feedback").

This interpretation is confirmed by applying canons of statutory construction to the language of section 770.01. The canon of ejusdem generis "states that when a general phrase follows a list of specifics, the general phrase will be interpreted to include only items of the same type as those listed." *State v. Weeks*, 202 So. 3d 1, 8 (Fla. 2016) (quoting *State v. Hearns*, 961 So. 2d 211, 219 (Fla. 2007)). In other words, "where general words follow an enumeration of specific words, the general words are construed as applying to the same kind or class as those that are specifically mentioned." *Id.* (quoting *Fayad v. Clarendon Nat'l Ins. Co.*, 899 So. 2d 1082, 1088-89 (Fla. 2005)). Applying this canon to section 770.01, it becomes clear that the general term "other medium" is limited by the specific terms that precede it: "publication or broadcast, in a newspaper, periodical . . . ."

Moreover, the doctrine of in pari materia "requires courts to construe statutes that relate to the same subject matter together to harmonize those statutes and give effect to legislative intent." *Anderson v. State*, 87 So. 3d 774, 777 (Fla. 2012). As explained in *Ross*, the notice provided for in section 770.01 and the opportunity to retract the offending statement provided for in section 770.02 go hand in hand. *See* 48 So. 2d at 415. Section 770.02 explicitly applies only to newspapers, periodicals, and broadcasts—the same types of publications specifically mentioned in section 770.01. Reading sections 770.01 and 770.02 in harmony, it becomes clear that the "other medium" language is not meant to expand the scope of section 770.01 beyond the news media.

*Id.* at 817-18. Applying these principles, the *Mazur* court concluded that neither the book nor movie company defendants were entitled to the protections of sections 770.01 and 770.02. *Id.* at 818-19.

18

If a movie and a nonfiction book about an alleged drug cartel insider do not constitute "other medium" under section 770.01, it is difficult to imagine how Ms. Baskin reading her diary entries on a vlog about a former secretary whom she repeatedly accuses of embezzlement could. *See Mazur*, 275 So. 3d at 818-19; *Five for Ent. S.A. v. Rodriquez*, 877 F. Supp. 2d 1321, 1327 (S.D. Fla. 2012) ("Florida courts have recognized that the statute does not apply to private parties or nonmedia defendants." (citing *Bridges v. Williamson*, 449 So. 2d 400, 401 (Fla. 2d DCA 1984))).

Ms. Baskin makes much of the fact that posting digital content online does not, in and of itself, render her a private, nonmedia defendant. In other words, media defendants are not limited to those who work in print media. True enough. But in this day and age, that's no longer a point in need of proving. *See Five for Ent.*, 877 F. Supp. 2d at 1327 ("Whether the phrase 'other medium' in § 770.01 includes the internet is not the critical issue here, and, in this Court's view, not even open for debate. That the internet constitutes a[n] 'other medium' for the purposes of § 770.01 should be well-settled."). Rather, our focus remains on the content of the digital publication and the central issue of whether it could be likened to the kind of content newspapers, broadcasters, and periodicals publish (whether in print or online), because that is all that sections 770.01 and .02 encompass. Ms. Baskin's vlog and website postings fall short of that mark.

It is true the landscape of news publication has drastically changed. There has been a great democratization in how the written word can be published, a change some have likened to the one wrought by the invention of the Gutenberg press. *See generally* Russell L. Weaver, *Free Speech in an Internet Era*, 58 U. Louisville L. Rev. 325, 329-

19

30 (2020) ("The communications revolution sparked by the internet has been as transformational as the revolution sparked by Gutenberg's invention of the printing press."). But we also addressed that facet of the changing times in *Mazur* when we remarked:

> [A]s technology develops and society's media consumption changes, becoming increasingly geared toward instantaneous access, the line between traditional news media and other forms of media may become blurred. Many people get their news via Facebook, YouTube, Twitter, Instagram, LinkedIn, or Reddit. Podcasts have boomed in popularity, and many cover current events. Shows and movies—many of which are documentaries, docuseries, or based on true stories—can be streamed on services such as Netflix, Amazon Prime Video, and Hulu. These technological developments may also make it easier to issue corrections and retractions that actually reach the intended audience. Apps can send push notifications with corrections or retractions straight to users' smart phones. Corrections and retractions can be posted to and shared widely on social media.

*Mazur,* 275 So. 3d at 818-19 (footnotes omitted).

Changing times do not alter statutory text; amendments do. As we said in *Mazur,* 275 So. 3d at 819: "Whether the presuit notice protection under section 770.01 should have a wider reach in light of recent technological developments is a matter for the Florida Legislature to decide."

IV.

Because the complaint included allegations that could, if proven, constitute defamation and Ms. Baskin was not a media defendant, we reverse the circuit court's judgment except as to the one count that has not been challenged, which we affirm without comment. We remand for further proceedings consistent with this opinion.

Affirmed in part; reversed in part; remanded.

20

CASANUEVA and ROTHSTEIN-YOUAKIM, JJ., Concur.

_____

Opinion subject to revision prior to official publication.